The opinion of this Court was delivered by Oldham, J., as follows: This was a bill filed by the Appellants, as heirs at law of Nathan Cloyes, deceased, against the Appellees in the Pulaski Circuit Court. The bill charges that Nathan Cloyes, in his lifetime, by virtue of an act of the Congress of the United States of America, entitled “an act to grant pre-emption to settlers on the public lands,” approved May 29th, 1830, as a settler and occupant of the public land, to-wit: on and of the north-west fractional quarter of section numbered two, in township numbered one, north of range numbered twelve west, in said county of Pulaski, prior to the passage of that act, being then in the possession thereof, and having cultivated some part thereof in the year one thousand eight hundred and twenty-nine, was and became thereby authorized and entitled to enter with the Register of the Land Office, for the district in which said fractional quarter of said section of land lay, by legal subdivisions, any number of acres not more than one hundred and sixty, or a quarter section, to include his improvement, upon paying to the United States the then minimum price of said land, provided such land should not have been reserved for the use of the United States, or either of the. several States in which any of the public lands might be situated, or reserved from sale by act of Congress, or by order of the President, or appropriated for any purpose whatever; that being so authorized and entitled by said act of Congress, the said Nathan Cloyes,in his life-time, on the 23d day of April, 1831, and whilst the said act was in full force, at the Land Office at Batesville, in said State of Arkansas, which was then the Land Office in and for the district in which said fractional quarter section of land was then situated, by his own affidavit and by the affidavit and evidence of John Saylor, Nathan May-nor and Elliott Bussey, made proof of 1ns settlement and improvement on and of the said fractional quarter section of land, and of his right to a pre-emption thereof according to iho provisions of said act to the satisfaction of the Register and ¡deceiver of said Land District, agreeably to the rules prescribed by the Commissioner of the General Land Office, for that purpose; and on the 28th day of May, A. D. 1831, the said act of Oo.uj.-o.cs being then still in full force, Hartwell Eos well, the RcgU-ter, and John Redman, the Receiver of said land district, granted to the saidNathan Cloyes,then still living, the privilege of entering the said land upon which he had so established his right. The bill exhibits copies of the proofs of pre-emption with the endorsement of approval thereon by the Land Officers. The bill then charges that having made said proof and been granted, and allowed the privilege of entering said quarter section of land, said Nathan Cloycs, on the 23 th day of May, A. D. 1831, made application to the Register of said Land Office at Batesville, to enter the said north-west fractional quarter of section two, in township one, north of range twelve west, containing thirty acres and eighty-eight hundredths of an acre, and also the north-east fractional quarter of the same section, containing forty-two acres and thirty-two hundredths of an acre, and also the north-west and north-east fractional quarters of sections numbered one, in the same township and range, containing thirty-five acres and forty one-hundreths of an acre; the said fractional quarter sections containing together, one hundred and eight acres and sixty one-hundreths of an acre, and in legal subdivisions, and then and there offered to pay the said United States, and tendered to the said Receiver, the minimum price for said land, to-wit: the sum of one hundred and thirty-five dollars and seventy-six and one-fourth cents, which said fractional quarter sections of land were not reserved at that time, or previously, for the use of the United States, or either of the several States in which any of the public lands were situated, nor were said lands reserved from sale by act of Congress, or by order of the President, or appropriated for any purpose whatever, but said Register refused to permit the said Nathan to enter said lands, and the Receiver refused to receive the payment so tendered therefor, because they alleged the said Nathan could only enter the fractional quarter section aforesaid, upon which he had settled and made his improvement, and because the public surveys of said four fractional quarter sections of land, which were all contiguous, had not been returned, according to law, and that said surveys had not then been made, perfected, and returned. That by virtue of an act of of Congress, entitled “an act establishing land districts in the Territory of Arkansas,” approved June 25th, 1832, the said fractional quarter sections of land were transferred to, and made part of the Arkansas land district: the Land Office for which was located at Little Rock; and afterwards in pursuance of law, the papers and evidence relating to said pre-emption right, filed in the Land Office at Batesville,were transferred to, and filed in the said Land Office at Little Rock: that afterwards, by virtue of an act of Congress, entitled “an act granting to the Territory of Arkansas one thousand acres of land, for the erection of a CourtHouse and Jail at Little Rock,” approved, June 15th, 1832, and of an act entitled “an act to authorize the Governor of the Territory of Arkansas to sell the land granted to said Territory by an act of Congress, approved the 15th day of June, 1832, and-for other purposes, approved March 2d, 1833, John Pope, then Governor of said Territory, selected illegally and by mistake for the benefit of said Territory, among other lands, the said north-west fractional quarter of section numbered two as aforesaid, containing thirty acres and eighty-eight hundreths of an acre, and for which, as complainants arc informed, a patent was afterwards issued to the said Governor of said Territory of Arkansas, and his successors in office, for the purpose of erecting a Court-House and Jail at Little Rock: that said John Pope, as Governor, after-wards, and by virtue of or under pretence of an act of Congress entitled “an act granting a quantity of land to the Territory of Arkansas, for the erection of a public building at the seat of Government of said Territory,” approved March 2d, 1831, and “an act to authorize the Governor of the Territory of Arkansas to select ten sections of land granted to said Territory for the purpose of building a Legislative House for said Territory, and for other purposes,” approved July 4th, 1832, selected the said southeast fractional quarter of section two, and the said north-west fractional quarter and north-east fractional quarter of section one, as unappropriated lands, for the purpose of raising a fund for the erection of a public building at Little Rock, and having assigned the same to one William Russell, a patent was issued therefor on or about the 21st May, A. D. 1844: that both of said patents were issued in mistake and in violation of law, and in fraud of the legal and vested rights of said Nathan Cloyes: that after, the application of said Nathan Cloyes to enter said lands, and after his tender of payment therefor had been refused as aforesaid, an act of Congress entitled “an act supplemental to the act granting the right of pre-emption to settlers on the public lands, approved the twenty-ninth May, A. D. 1830,” was approved on the 14th July, 1832, authorizing settlers upon th public lands entitled to a pre-emption on public lands under the act of 29th May, 1830, to enter the same under the provisions ot said supplemental act: that said last mentioned act was approved and in force before the said Governor Pope selected said lands, and that the public surveys of said lands were made and perfected on or about the 1st December, 1833, and returned to the Land Office, in the beginning of the year 1834: that by virtue of said last mentioned act, said Nathan Cloyes, having in the meantime departed this life, the said complainants, as his heirs, applied to enter said four fractional quarter sections of land on the 5th day of March, 1834, at the Receiver’s office, at Little Rock, by the hands of Ben Desha, they paid to the Receiver the sum of $135, 76¿ for the same, who granted a receipt and certificate therefor, and endorsed on said receipt that a part of the land for which said receipt was given, to-wit: the north-west fractional quarter of section two was a part of the location made by Governor Pope in selecting the 1000 acres aforesaid; and that said endorsement was made by direction of the Commissioner of the General Land Office. The bill contains other allegations necessary for the introduction of parties, and prays relief, &c. Process having issued, a portion of the defendants appeared and answered the bill; and others appeared and filed demurrers. The demurrers being sustained, the complainants have appealed to this court. It is first urged, in support of the demurrer, that the bill is multifarious, and demurrable for a misjoinder of parties. This objection, we conceive, cannot be sustained. The claim asserted by the complainants is entire, accruing to them by the same right, and cannot be well separated or made the subject of different and distinct actions. Although the interests of the various defendants are separate and distinct, yet they all derive title from the same source, under two patents, which, as the complainants contend, were issued in violation of their rights. The complainants could not obtain complete relief to the extent of their claim, without asserting the whole of it in their bill, and consequently making every person a party holding under the adverse title which they seek to set aside. The relief of the complainants would be incomplete unless both patents should be set aside. This would effect the interests of all the defendants, and would not be binding upon them unless they were made parties with the privilege of defending their title. Besides, it is one great object with Courts of Equity to prevent a multiplicity of suits. Were a different rule to be observed, the complainants might be driven to a separate suit against each defendant, for the purpose of establishing their one entire title to the lands in controversy. 2: The next point to be considered, is, whether Cloyes was entitled to a pre-emption on any other lands, than the north-west quarter of section two, inasmuch as his entire improvement was confined to that tract. Upon this point we adopt the construction given to the act of Congress by the Commissioner of the General Land Office, as being well founded and proper. The Commissioner in his circular instructions, dated June 10th, 1830, and found in the land laws, (Instructions, &c., Vol. 2, 539, No. 479,) says, “when the whole of the improvement is embraced in the limits of a quarter section, the occupant must be confined to the entry of that particular quarter section.” Again, the Commissioner in his letter to the Register and Receiver at St. Stephens, Alabama, dated May 31st, 1831, in the same Vol. 554, No. 497, says, “if therefore all the improvements and cultivation of the settler are included in a fractional section or a legal subdivision containing less than one hundred and sixty acres, he can have no claim to enter any tract to make up the maximum allowance of the law.” This construction of the Commissioner, as before stated, we conceive to be the proper construction, and we give it our entire concurrence; and consequently Cloyes could not, by virtue of the occupancy and cultivation contained in the bill, claim aright of pre-emption beyond the fractional quarter section upon which such occupancy and cultivation were confined. It has been held that the “decisions of the Register and Receiver are conclusive as to all matters within their jurisdiction, in the absence of fraud; for the act of Congress, for many purposes, makes them judical officers, and gives them exclusive cognizance of a particular class of cases.” Wilcox v. Jackson, 13 Pet. 490. Nicks' hrs. v. Rector, 4 Ark. R. 250. Allowing Cloyes to have been entitled by the act of Congress to a right of pre-emption, to the full extent of his claim, it is not within the province of a State Court of Equity to correct the Errors of the land officers, who are clothed with exclusive jurisdiction. The Register and Receiver decided, that he was not entitled to a pre-emption beyond the fractional quarter section, which included his settlement and cultivation, and it is not the province of this Court to say that their decision was erroneous and that he was entitled to no more. 3: At the time, or shortly after, filing his proof to a right of pre-emption, Cloyes tendered payment for the whole of the land claimed by him, at the minimum price. The land at that time was not subject to sale by pre-emption, as the surveys had not been completed and the plats returned to the Land Office. After the establishment of the “Arkansas Land District,” and a transfer of the books, papers, &c., to the land officer at Little Rock, and before the expiration of twelve months after the plats had been returned to the Land Office, the complainants, by Ben Desha, paid to the Receiver at Little Rock, the minimum price for the whole of the land claimed, and took his receipt therefor, upon which he made an endorsement under the direction of the Commissioner of the General Land Office: “That the north-west fractional quarter of section two forms a part of the location made by Governor Pope, in selecting 1000 acres of land adjoining the town of Little Rock, granted by Congress, to raise a fund for building a Court House and Jail for the Territory of Arkansas.” The Receiver has no legal authority to receive payment for any of the public lands, until a sale is made by the Register. In this case, the Register declared the lands not subject to entry by the complainants, and accordingly refused to permit them to enter the.same. The receipt given by the Receiver therefore conferred no title whatever upon the complainants, and can be regarded only as having the operation and effect of a tender. If at the time of making such payment to the Receiver, the complainants were entitled to a pre-emption to any portion of the lands claimed, although the amount paid was greater than the price of the land, to which they were so entitled, yet it was good for the amount to which they were entitled. It was a mere precautionary measure and was intended for the whole land claimed, if entitled to the whole; and if not, then for as much as they might be entitled to. So are such tenders or payments regarded by the Commissioner of the General Land Office. See Instructions, &c., Public lands, Vol. 2, 132, No. 84. Whether such a tender, would be good at common law, it is not necessary to enquire! Such a tender is regarded as sufficient by the General Land Office, which is charged by law for the protection of the General-Government, and will be held good by this court against the government, and, consequently those claiming-under her. ^ 4: Having disposed of these preliminary questions, we will" proceed to inquire whether, by the bill, Cloyes is shown to have been entitled to a pre-emption to the particular fractional quarter including his improvement. The act of Congress of the 29th May, 1830, section 3, Provides: “That prior to any entries being made under the privilege of this act, proof of settlement or improvement shall be made to the satisfaction of the Register and Receiver of the land district, in which such lands may lie, agreeably to the rules to be prescribed by the Commissioner of the General Land Office, for that purpose.” The Commissioner, in his circular instructions to the Registers and Receivers, dated June 10th, 1830, already referred to, says, “the evidence must be taken before a justice of the peace in the presence of the Register and Receiver, and be in answer to such interrogatories propounded by them, as may be best calculated to elicit the truth.” The regulations so prescribed by the Commissioner are as binding and obligatory upon the Register and Receiver as the law itself. The manner in which they are to receive satisfactory proof of a right of pre-emption, is not left to their discretion, but is fixed by definite rules, from which no one but the Commissioner himself can authorize a departure, and the Register and Receiver must conform to them. It devolves upon the Commissioner to prescribe the mode and nature of the proof; but after it is received, it is exclusively within the province and jurisdiction of the Register and Receiver to determine whether it is sufficient and satisfactory. They can acquire jurisdiction of the evidence and of the subject matter so as to adjudicate upon it, only in the manner pointed out by the rules made under, and in conformity with, the act of Congress. An allowance of a right of pre-emption upon the personal knowledge of the Land Officers, in the absence of proof, would be void against the United States, and consequently a claim to a right of pre-emption so granted would not affect or impair the adverse claims of persons holding under the United States; and such, we conceive, would be the case were a pre-emption granted upon proof not taken in the presence of the Register and Receiver, as prescribed by the Commissioner in conformity with the law. This point, however, is only made in argument, as the bill alleges, “that the proof was made to the satisfaction of the Register and Receiver, agreeably to the rule prescribed by the Commissioner of the General Land Office, for that purpose.” The exbibit shows that “the proof was taken in the presence of the Register.” The allegation contained in the bill is admitted by the demurrer. If it should be denied by answer, the exhibit becomes an instrument of proof under the issue so formed. The act of Congress, under which Cloyes made his proof, was approved the 29th May, 1830, and expired one year from its passage, by limitation. During the existence of the law, he was unable to avail himself of the benefits and privileges which it conferred, because the surveys had not been completed and the plats returned to the Land Office. With the expiration of the act, his right to a pre-emption ceased, and he had no right to claim the benefits of the law after it ceased to exist. The act did not confer a vested legal or equitable interest, which could be enforced against the Government, but a mere gratuity or bounty, for the obtaining and protection of which, against those who would defeat the intention of the donor, courts will interfere and grant relief. Although the right of pre-emption granted by act of Congress to settlers upon the public lands, is a mere gratuity, yet it is one of sound policy on the part of the General Government, as a means of settling our extensive public domain with a hardy and enterprising population; and of actual benefit to the settler upon the public lands as a protection to him in the enjoyment of the labor which he may have bestowed upon such land. The subject, however, is completely within the control of Congress. The gratuity may be granted or withheld at pleasure, and if granted may be revoked, if done before the acceptance of, and compliance with, the terms upon which it is offered. The 4th section of the act of 29th May, 1830, provides that, “the right of pre-emption contemplated by this act, shall not extend to any land which is reserved from sale by act of Congress, or by order of the President, or which may have been appropriated for any purpose whatsoever.” The act,having expired by limitation, was revived by the supplemental act of July 14th, 1832. This latter act provides, “that all the occupants and settlers upon the public lands of the United States, who are entitled to a pre-emption according to the provisions of the act of Congress, approved twenty-ninth day of May, eighteen hundred and thirty, and who have not been, or shall not be enabled to make proof and enter the same, within the time limited in said act in consequence of the public surveys not having been made and returned, or where the land was not attached to any land district, or where the same has been reserved from sale on account of a disputed boundary between any State and Territory, the said occupants shall be permitted to enter the said lands on the same conditions in every respect as are prescribed in said act, within one year after the surveys are made, or the land attached to a land district, or the boundary line established,” &c. Although this act is general, and confers upon occupants coming within its perview all the benefits and privileges of the act of 1829, yet it does not confer a right of pre-emption to lands disposed of, or otherwise appropriated by act of Congress between the dates of its expiration and that of its revival, by the supplemental act. If the land, to which Cloyes claimed his right of pre-emption, remained undisposed of in any manner, at the time of the passage of the supplemental act, then he comes within the provisions of the act, and is entitled to the benefits which it confers; otherwise he is not. On the 15th June, 1832, an act was passed “granting to the Territory of Arkansas, one thousand acres of land, contiguous to, and adjoining the Town of Little Rock, for the erection of a ■Court House and Jail in said town; to be selected by the Governor,” &c. This act was passed one month before the supplemental act of 14th July, 1832, reviving the pre-emption act of ■1830, and consequently at the time of its passage there was no law in existence conferring upon Cloyes a right of pre-emption. The Governor was authorized by the act to select any land belonging to the United States, unappropriated at the date of the act, “contiguous to and adjoining the Town of Little Rock.” We will not enquire whether the supplemental act,passed on the 14th July, 1832, conferred a right of pre-emption on Cloyes which the Governor was bound to notice in selecting the one thousand acres. If there was not more than one thousand acres of unappropriated public lands, “contiguous to, and adjoining the Town of Little Rock,” exclusive of the fractional quarter section claimed by Cloyes, then that quarter section had at the time of the passage of the supplemental act been already appropriated by an act of Congress, for the building of a Court House and Jail in the Town of Little Rock, and he was not entitled to any pre-emption upon it. This fact the bill does not show, and this court will not presume that there was a sufficiency of land which the Governor could select exclusive of the quarter section occupied by Cloyes. For this reason, we think the demurrer to the bill was properly sustained by the court below, and we accordingly affirm the decree. Statement by tiie Repoetee of the Supeeme Couet of the United States. This case was brought up from the Supreme Court of the State of Arkansas, by a writ of error issued under the twenty-fifth section of the Judiciary Act. It involved the validity of an entry of four fractional quarter sections of land, one of which only, namely, the north-west fractional quarter section, number two in township one of north range twelve west, was passed upon by this Court. The history of the claim is this: The act of Congress passed on the 29th of May, 1830, (4 Stat. at Large 420,) gave to every occupant of the public lands prior to the date of the act, and who had cultivated any part thereof in the year 1829, a right to enter at the minimum price by legal subdivisions, any number of acres not exceeding one hundred and sixty or a quarter section, to include his improvements: Provided, The land shall not have been reserved for the use of the United States or either of the several States. In the third section of the act, it is provided, that, before any entries being made under the act, proof of settlement or improvement shall be made to the satisfaction of the Register and Receiver of the land district in which the lands may lie, agreeably to the rules prescribed by the Commissioner of the General Land Office for that purpose. On the 10th of June, 1830, the Commissioner issued his instructions to the Receivers and Registers, under the above act, in which he said, that the fact of cultivation and possession required, “must be established by the affidavit of the occupant, supported by such corroborative testimony as may be entirely satisfactory to both; the evidence must be taken by a justice of the peace, in the presence of the Register and Receiver.” And the Commissioner directed, that, where the improvement was wholly on a quarter section, the occupant was limited to such quarter; but where the improvement is situated in different quarter sections adjacent, he may enter a half-quarter in each to embrace his entire improvement. Another circular, dated 7th February, 1831, was issued instructing the land officers, where persons claiming pre-emption rights had not been prevented, under the above circular, from making an entry, “by reason of the township plats not having been furnished by the Surveyor General to the Register of the Land Office, the parties entitled to the benefit of said act may be permitted to file the proof thereof under the instructions heretofore given, identifying the tract of land as well as circumstances will admit, any time prior to the 30th of May, next.” And they were requested to “keep a proper abstract or list of such cases wherein the proof shall be of a character sufficient to establish, to their entire satisfaction, the right of the parties, respectively, to a preemption,” &c. No payments, however, were to be received on account of pre-emption rights duly established, in cases where the townships were known to be serveyed, but the plats whereof were not in their office, until they shall receive further instructions It may be here remarked, that the public surveys of the land in question were not completed until the 1st of December, 1833, nor returned to the Land Office until the beginning of the year 1834. On the 2d of March, 1831, Congress passed an act (4 Stat. at Large 473,) “granting a quantity of land to the Territory of Arkansas, for the erection of a public building at the seat of government of said Territory;” but this act did not designate what specific tract of land should be granted for that purpose. On the 23d of April, 1831, Cl oyes filed the following affidavit in the office of the Register, in support of his claim to a preemption right: PnE-EMraoN Claim, May 29, 1830. “Nathan Cloyes’s testimony, taken on the 23d of April, 1831, before James Boswell, a justice of the peace for the county of Independence, in the Register’s office, in the presence of the Register. “Question by the Register.— What tract of the public lands did you occupy in the year 1829, that you claimed a right of preemption upon ? “Answer. — On the north-west fractional quarter of section two, in township one north of range twelve west, adjoining the Q,ua-paw line, being the first faction that lies on the Arkansas river, immediately below the town of Little Rock, and contains about twenty-eight or twenty-nine acres, as I have been informed by the county surveyor of Pulaski county; and I claim under the law the privilege to enter the adjoining fraction or fractions so as not [to] exceed one hundred and sixty-acres, all being on the river below the before named fraction. Question as before. — Did. you inhabit and cultivate said fraction of land in the year 1829; and if so, what improvement had you in that year in cultivation ? Answer. — -I did live on said tract of land in the year 1829, and had done so since the year 1826; and in the year 1829, aforesaid, I had in cultivation a garden, perhaps to the extent of an acre; raised vegetables of different kinds, and corn for roasting-years (ears), and I lived in a comfortable dwelling, east of the Quapaw line, and on the before named fraction. Question as before. — Did you continue to reside and cultivate your garden aforesaid on the before named fraction until the 29th of May, 1830? Answer.- — I did, and have continued to do so until this time. Question as before. — Were you, at the passage of the act of Congress under which you claim a right of pre-emption, a farmer; or, in other words, what was your occupation? Answer. — I was a tin-plate worker, and cultivated a small portion of the fraction before named for the comfort of my family, and carried on my business in a shop adjoining my house. Question as before.- — Do you know of any interfering claim under the law, that you claim a pre-emption right upon the fraction whereon you live? Answer. — I know of none. And further this deponent saith not. NATHAN CLOYES. Sworn and subscribed to, before me, the date aforesaid. J. BOSWELL, J. P.” On the same day, Cloyes filed also the corroborative testimnoy of John Saylor, Nathan W. Maynor, and Elliott Bussey! On the 28th May, 1831, the Register and Receiver made the following entry, and gave Cloyes the following certificate: PitE-EjvimoN Claim, 29 May, 1830. Nathan Cloyes, No. 24,N. W. fractional 2, 1 N. 11 W.,granted for the above fractional and reject the privilege of entering ■the adjoining fractions. May 28, 1831. H. BOSWELL, Register. JOHN REDMAN, Receiver” On the 15th of June, 1832, Congress passed an act, (4 Stat. at Large, 531,) granting one thousand acres of land to the Territory of Arkansas, “contiguous to, and adjoining the town of Little Rock,” for the erection of a Court House and Jail at Little Rock. On the 4th of July, 1832, Congress passed another act, (4 Stat. at Large 563,) authorizing the Governor of the Territory to select ten sections of land to build a Legislative house for the Territory! On the 4th of July, 1832, Congress passed an act, (4 Stat. at Large 603,) giving to the persons entitled to pre-emption under the act of 1830, (but who had not been able to enter the same within the time limited, because the township plats had not been made and returned) one year from the time when such township plats should be returned, to enter said lands upon the same terms and conditions as prescribed in the act of 1830. On the 2d of March, 1833, Congress passed an act, (4 Stat. at Large 661,) authorizing the Governor of the Territory to sell the lands granted by the act of 15th June, 1832. Under these acts of Congress, Governor Pope made a part of his location upon the fractional quarter sections in question, upon the 30th of January, 1833. It has been already mentioned, that on the 1st of December 1833, the public surveys were completed, and returned to the Land Office in the beginning of the year 1834! On the 5th of March, 1834, the heirs of Cloyes (he being dead) paid for the four fractional quarter sections, and took the follow- “Receiver’s Office, at Little Rock, March 5th, 1834. Received by the hands of Bon Desha, from Lydia Louisa Cloyes, Mary Easther Cloyes, Nathan Henry Cloyes, and William Thomas Cloyes, (heirs of Nathan Cloyes, deceased, late of Pulaski county, A. T.,) the sum of one hundred and thirty-five dollars and seventy-six and J cents, being in payment for the north-west and north-east fractional quarters of section two, and the north-west and north-east fractional quarters of section one, in fractional township one, north of the base line, and range twelve, west of the fifth principal meredian, containing in all one hundred and eight 61-100 acres, at $1,25 per acre. $135 76*. P. T. CRUTCHFIELD, Receiver. A part of the land for which the within receipt is given, to-wit:' “The north-west fractional quarter of section two forms a part of the location made by Governor Pope, in selecting 1,000 acres adjoining the town of Little Rock, granted by Congress to raise a fund for building a Court Plouse and Jail for the Territory of Arkansas; and this endorsement is made by direction of the Commissioner of the General Land Office. P. T. CRUTCHFIELD, Receiver, Receiver’s Office, at Little Rock, March 5th, 1843.” In 1843, the heirs of Cloyes filed a bill against the persons mentioned in the title of this statement, who had purchased various interests in these fractional quarter sections, and claimed title under Governor Pope. The bill was filed in the Pulaski Circuit Court of the State, setting forth the above facts, and praying thatthe defendants might be ordered to surrender their patents and other muniments of title to the complainants. The parties who were interested in the north-west fractional quarter of section number two, answered the bill. The other parties demurred. The answers admitted that proof of a pre-emption right to the north-west fractional quarter of section two was made by Cloyes at the time and in the manner set forth in the bill; but deny that he had a valid pre-emption to it. They admit, also, that Governor Pope selected said quarter in pursuance of the two acts of Congress of 15th June, 1832, and 2d March, 1833, but deny that he did so illegally or by mistake. In July, 1844, the Pulaski Circuit Court sustained the demurrer of the parties who had demurred, and dismissed the bill as to those who had answered. In July, 1847, the Supreme Court of Arkansas, to which the cause had been carried, affirmed the judgment of the Court below, and a writ of error brought the case up to this court. It was argued by Mr. Lawrence and Mr. Badger, for the plaintiffs in error, and Mr. Sebastian, for the defendants in error. Mr. Justice McLean delivered the opinion of the Court. This writ of error brings before us a decree of the Supreme Court of the State of Arkansas. The complainants filed their bill in the Pulaski Circuit Court, of that State, charging that Nathan Cloyes, their ancestor, during his life, claimed a right of pre-emption under the act of Congress of the 29th of May, 1830, to the north-west fractional quarter of section numbered two, in township one, north of range twelve west. That he was in possession of the land claimed when the above act was passed and had occupied it in 1829. That he was entitled to enter, by legal subdivisions, any number of acres, not more than one hundred and sixty, or a quarter section, to include his improvement, upon paying the minimum price for said land. That Cloyes, in his life-time, by his own affidavit, and the affidavits of others, made proof of his settlement on, and improvement of, the above fractional quarter, according to the provisions of the above act, to the satisfaction of the Register and Receiver of said land district, agreeably to the rules prescribed by the Commissioner of the General Land Office; and on the 20th of May, 1831, Hartwell Boswell, the Register, and John Redman, the Receiver, decided that the said Cloyes was entitled to the pre-emption right claimed. That on the same day he applied to the Register to enter the north-west fractional quarter of section two, containing thirty acres and eighty-eight hundredths of an acre; also the north-east fractional quarter of the same section, containing forty-two acres and thirty-two hundredths of an acre; and also the north-west and north-east fractional quarters of section numbered one in the same township and range, containing thirty-five acres and forty one-hundredths of an acre, the said fractional quarter sections containing one hundred and eight acres and sixty one-hun-dreths of an acre: and offered to pay the United States, and tendered to the Receiver, the sum of one hundred and thirty-five dollars, seventy-six and a fourth cents, the government price for the land. But the Register refused to permit the said Cloyes to enter the land, and the Receiver refused to receive payment for the same, on the ground that he could only enter the quarter section on which his improvement was made. That the other quarter sections were contiguous to the one he occupied. That, under the act of the 29th of June, 1832, entitled, “an act establishing land districts in the Territory of Arkansas,” the above fractional sections of land were transfered to the Arkansas land district, and the land office was located at Little Rock, to which the papers in relation to this claim of pre-emption were transmitted. The bill further states, that, under an act of Congress of the 15th of June, 1832, granting to the Territory of Arkansas one thousand acres of land for the erection of a Court-House and Jail at Little Rock, and under “an act to authorize the Governor of the Territory to sell the land granted for a Court-House and Jail and for other purposes,” dated 2d March, 1833, John Pope, then Governor of said Territory, among other lands, selected illegally and by mistake, for the benefit of the Territory, the said north-west fractional quarter of section numbered two, for which a patent was issed to the Governor of the Territory and his successors in office, for the purposes stated. That the said John Pope, as Governor, under an act granting a quantity of land to the Territory of Arkansas, for the erection of a public building at the seat of Government of said Territory dated 2d March, 1831, an act to authorize the Governor of the Territory to select ten sections to build a Legislative House for the Territory, approved 4th July, 1832, selected the north-east fractional quarter of section two, and the north-west fractional quarter, and the north-east fractional quarter of section one, as unappropriated lands, and having assigned the same to William Russell, a patent to him was issued, therefor, on or about the 21st of May, 1834, both of which, the complainants allege, were issued in mistake and in violation of law, and in fraud of the legal and vested right of their ancestor, Cloyes. That after the refusal of the Receiver to receive payment for the land claimed, an act was approved 14th July, 1832, continuing in force the act of the 29th of May, 1830, and which specially provided, that those who had not been enabled to enter the land, the pre-emption right of which they claimed, within the time limited, in consequence of the public surveys not having been made and returned, should have the right to enter said lands on the same conditions, in every respect, as prescribed in said act, within one year after the surveys should be made and returned, and the occupants upon fractions in like manner to enter the same, so as not to exceed in quantity one quarter section. And that this act was in full force before Governor Pope selected said lands as aforesaid. That the public surveys of the above fractional quarter sections were made and perfected on or about the 1st of December, 1833, and returned to the land office the beginning of the year 1834. On the 5th of March, 1834, the complainants paid into the land office the sum of one hundred and thirty-five dollars and seventy-six and one-fourth cents, in full for the above named fractional quarter sections. That a certificate was granted for the same, on which the Receiver endorsed, that the north-west fractional quarter of section two was a part of the location made by Governor Pope in selecting one thousand acres adjoining the town of Little Rock, granted by Congress to raise a fund for building a Court-House and Jail for the Territory, and that that endorsement was made by direction of the Commissioner of the General Land Office. That the Register of the Land Office would not permit the said fractional quarter sections to be entered. That the patentees in both of said patents, at the time of their application to ente'r the lands, had both constructive and actual notice of the right of Cloyes. And that the present owners of any part of these lands had also notice of the rights of the complainants. The answer of the Real Estate Bank and Trustees admits the proof of the pre-emption claim of Cloyes, but they say, “from beginning to end it is a tissue of fraud, falsehood and perjury, not only on the part of Cloyes, but also on the part of those persons by whose oaths the alleged pre-emption was established. And they allege, that the lots four, five and six, in block eight, in fractional quarter section two, claimed by the bank, were purchased of Ambrose H. Sevier, in the most perfect good faith, and without any notice or knowledge whatever, either constructive or otherwise, of any adverse claim thereto.” That they have made improvements on the same, which have cost twenty-five thousand dollars, without ever having it intimated to them that there was any adverse claim until all of said improvements had been completed. James S. Conway, in his answer, denies the validity of the pre-emption right set up in the bill, and alleges that it was falsely and fraudulently proved. And he says that when he purchased, “he did not know that there was any bona fide adverse claim or right to said lots, or any of them; and he avers, that he is an innocent purchaser for a valuable consideration, and without actual or implied notice, except as hereinafter stated.” And he admits that he occasionally heal’d the claim of Cloyes spoken of, but always with the qualification that it was fraudulent and void, and had been rejected by the government. Samuel A. [H.] Hempstead, in his answer, denies that, at the time of the purchase of said lots, or the recording of said deed, he had notice, either in fact or law, of the complainants’ claim. The other defendants filed special demurrers to the bill. The Circuit Court, as it appears, sustained the demurrer, and in effect dismissed the bill. The cause was taken to the Supreme Court of Arkansas by a writ of error, [by appeal,] which affirmed the decree of the Circuit Court. The demurrers admit the truth of the allegations of the bill, and, consequently, rest on the invalidity of the right asserted by the complainants. The answers also deny that Cloyes was entitled to a pre-emption right, and a part, if not all of them, allege that they were innocent purchasers, for a valuable consideration, without notice of the complainants’ claim. The first section of the act of 29th May, 1830, gave to every occupant of the public lands prior to the date of the act, and who had cultivated any part thereof in the year 1829, a right to enter at the minimum price, by legal subdivisions, any number of acres not exceeding one hundred and sixty or a quarter section, to include his improvement; provided, the land shall not have been reserved for the use of the United States, or either of the several States. In the third section of the act it is provided, that, before any entries being made under the act, proof of settlement or improvement shall be made to the satisfaction of the Register and Receiver of the land district in which the lands may lie, agreeably to the rules prescribed by the Commissioner of the General Land Office for that purpose. On the 10th of June, 1830, the Commissioner issued his instructions to the Receivers and Registers under the above act, in which he said, that the fact of cultivation and possession required “must be established by the affidavit of the occupant, supported by such corroborative testimony as may be entirely satisfactory to both; the testimony must be taken by a Justice of the Peace in the presence of the Register and Receiver.” And the Commissioner directed, that, where the improvement was wholly on a quarter section, the occupant was limited to such quarter; but where the improvement is situated in different quarter sections adjacent, he may enter a half-quarter in each to embrace his entire improvement. Another circular, dated 7th February, 1831, was issued, Instructing the land offices, where persons claiming pre-emption rights had been presented under the above circular from making an entry, “by reason of the township plats not having been furnished by the Surveyor General to the Register of the Land Office, the parties entitled to the benefit of said act may be permitted to file the proof thereof, under the instructions heretofore given, identifying the tract of land as well as circumstances will admit, any time prior to the 30th of May next.” And they were requested to “keep a proper abstract or list of such cases wherein the proof shall be of a character sufficient to establish to their entire satisfaction the right of the parties, respectively, to a preemption,” &c. “No payments, however, were to be received on account of pre-emption rights duly established, in cases where the townships were known to be surveyed, but the plats whereof were not in their office, until they shall receive further instructions.” Under this instruction, on the 28th of May, 1831, the Register and Receiver held that Nathan Cloyes was entitled to the northwest fractional quarter, as stated in the bill, but rejected the privilege of entering the adjoining fractions. Several objections are made to this procedure. It is contended that the land officers had no authority to act on the subject, until the surveys of the township were returned by the Surveyor General to the Register’s office; and also, that in receiving the proof of the pre-emption right of Cloyes, the land officers did not follow the instructions of the Commissioner. The first instruction of the Commissioner, dated 10th June, 1830, required the proof to be taken in presence of the Register and Receiver, and it appears that the proof was taken in the presence of the Register only. The law did not require the presence of the land officers when the proof was taken, but in the exercise of his discretion the Commissioner required the proof to be so taken. Having the power to impose this regulation, the Commissioner had the power to dispense with it, for reasons which might be satisfactory to him. And it does appear that the presence of the Register only, in Cloyes’ case, was held sufficient. The right was sanctioned by both the land officers, and by the Commissioner also, so far as to receive the money on the land claimed, without objection as to the mode of taking the proof. And, as regards the authority for this procedure by the land officers, it appears to be covered by the above circular of the Commissioner, dated 7th February, 1831. In the absence of the surveys, the parties entitled to the benefits of the act of 1830, were “permitted to file the proof thereof,” &c., identifying the tract of land, as well as circumstances will admit, any time prior to the 30th of May, 1831. The Register and Receiver were constituted, by the act, a tribunal to determine the rights of those who claimed pre-emptions under it. From their decision no appeal was given. If therefore they acted within their powers, as sanctioned by the Commissioner, and within the law, and the decision cannot be impeached on the ground of fraud and unfairness, it must be considered final. The proof of the pre-emption right of Cloyes being “entirely satisfactory” to the land officers under the act of 1830, there was no necessity of opening the case, and receiving additional proof, under any of the subsequent laws. The act of 1830, having expired, all rights under it were saved by the subsequent acts. Under those acts, Cloyes was only required to do what was necessary to perfect his right. But those steps within the law, which had been taken, were not required to be taken again. It is a well established principle,that where anindividual,in the prosecution of a right does every thing which the law requires him to do,andhe fails to attain his right by the misconduct or neglect of a public officer, the law will protect him. In this case, the preemptive right of Cloyes having been proved, and an offer to pay the money for the land claimed by him, under the act of 1830, nothing more could be done by him, and nothing more could be required of him under that act. And, subsequently, when he paid the money to the Receiver under subsequent acts, the surveys being returned, he could do nothing more than offer to enter the fractions, which the Register would not permit him to do. This claim of pre-emption stands before ns in a light not less favorable than it would have stood if Cloyes or his representatives had been permitted by the land officers to do what, in this respect, was offered to be done. The claim of a pre-emption is not that shadowy right which by some it is considered to be. Until sanctioned by law, it has no existence as a sub-stantive right. But when covered by the law, it becomes a legal right, subject to be defeated, only by a failure to perform the conditions annexed to it. It is founded in an enlightened public policy, rendered necessary by the enter-prize of our citizens. The adventurous pioneer, who is found in advance of our settlements, encounters many hardships, and not unfrequently dangers from savage incursions. He is generally poor, and it is fit that his enterprise shall be rewarded by the privilege of purchasing the favorite spot selected by him, not to exceed one hundred and sixty acres. That this is the national feeling is shown by the course of legislation for many years. It is insisted that the pre-emption right of Cloyes extended to the fractional quarter sections named in the bill, the whole of them being less than one hundred and sixty acres. We think it is limited to the fractional quarter on which his improvement was made. This construction was given to the act by the Commissioner in his circular of the 10th of June, 1830. He says '‘The occupant must be confined to the entry of that particular quarter section which embraces his improvement.” The act gives to the occupant whose claim to a pre-emption is established, the right to enter, at the minimum price, by legal subdivisions, any number of acres not exceeding one hundred and sixty. But less than a legal subdivision of a section or fraction cannot be taken by the occupant. It is contended, however, that several fractional quarter sections adjacent to the one on which the improvement was made, may be taken under the pre-emptive right, which shall not exceed in the whole one hundred and sixty acres. And the second section of the act of 14th July, 1832, which provides “that the occupants upon fractions shall be permitted, in like manner, to enter the same so as not to exceed in quantity one-quarter section,” it is urged, authorizes this view. But in the case of Brown’s lessee, v. Clements et. al. 3 How. 666, this court say, the act of 29th May, 1830, “gave to every settler on the public lands the right of pre-emption of one hundred and sixty acres, yet, if a settler happened to be seated on a fractional section containing less than that quantity, there is no provision in the act by which he could make up the deficiency out of the adjacent lands, or any other lands.” Did the location of Governor Pope, under the act of Congress, affect the claim of Cloyes? On the 15th of June, 1832, one thousand acres of land were granted, adjoining the town of Little Rock, to the Territory of Arkansas, to be located by the Governor. This selection was not made until the 30th of January, 1833. Before the grant was made by Congress of this tract, the right of Cloyes to a pre-emption had not only accrued, under the provisions of the act of 1830, but he had proved his right to the satisfaction of the Register and Receiver of the land office. He had, in fact, done every thing that he could do to perfect his right. No fault or negligence can be charged to him. In the case above cited from 3 Howard, the court say — “The act of the 29th of May, 1830, appropriated the quarter section of land in controversy, on which Etheridge was then settled, to his claim, under the act, for one year, subject, however, to be defeated by his failure to comply with its provisions. During that time, this quarter section was not liable to any other claim,” &c. And the supplement to this act, approved 14th July, 1832, extended its ■benefits. The instruction of the Commissioner, dated September 14th, 1830, was in accordance with this view. He says, “It is therefore to be expressly understood, that every purchaser of a tract of land at ordinary private sale, to which a pre-emption claim shall be proved and filed according to law, at any time prior to the 30th of May, 1831, is to be either null and void (the purchase money thereof being refundable under instructions hereafter to be given) or subject to any legislative proceedings. By the grant to Arkansas, Congress could not have intended to impair vested rights. The grants of the thousand acres and of the other tracts, must be so construed as not to interfere with the pre-emption of Cloyes. The Supreme Court of the State, in sustaining the demurrers and dismissing the bill, decided against the pre-emption claimed by the representatives of Cloyes, and as we consider that a valid right, as to the fractional quarter on which his improvement was made, the judgment of the State court is reversed; and the cause is transmitted to that court for further proceedings before it, or as it shall direct, on the defence set up in the answers of the defendants, that they are bona fide purchasers of the whole or parts of the fractional section in controversy, without notice, and that that court give leave to amend the pleadings on both sides, if requested, that the merits of the case may be fully presented and proved as equity shall require. Mr. Justice Catkon, Mr. Justice Nelson and Mr. Justice Geiee, dissented. Mr. Justice Cateon : The Complainants allege that they have the superior equity to the fractional quarter section number two, and to the other lands claimed by the bill, by virtue of an entry under a preference right; and that the respondents purchased and took their legal title with full knowledge of such existing equity in the complainants. 1. The defendants claiming section number two (or part of it,) deny that any such equity exists under the legislation of Congress. 2. That they purchased and took title without any knowledge of the claim set up; and being innocent purchasers, no equity exists as to them for this reason also, regardless of any thing alleged against them. 3. That they expended large sums on the lands purchased, and made highly valuable improvements thereon, without any objection being made by complainants, or notice of their claim being given to respondents, and therefore a court of equity cannot interfere with their existing rights! The bill was dismissed without any particular ground having been stated in the decree why it was made for respondents; and in this condition of the record, the cause is brought here by writ of error, under the twenty-fifth section of the judiciary act. The case made on the face of the bill was rejected, and the inquiry on such general decree must be, whether the claim set up sought protection under an act of Congress, or an authority exercised under one, so as to draw either in question, no matter whether the claim was well founded or not; and the fact being proved that such case was made, their jurisdiction must be assumed to examine the decree, and, this being clearly true in the present instance, jurisdiction must be taken, and the equity claimed on part of complainants re-examined. If, however, the decree had proceeded on the second or third grounds of defence, regardless of the first, and had so declared, then this court would not have jurisdiction to interfere, as no act of Congress, or authority exercised under it, would have been drawn in question. In regard to the lands claimed, except the fractional quarter section number two, we are agreed that the bill should be dismissed. So far the controversy is ended; and as to section number two, I think the bill should be dismissed also. The proof of occupationand cultivation was made in April, 1831, under the act of 1830, pursuant to an instruction from the Commissioner of the General Land Office having reference to that act. The act itself, the instruction given under its authority, and the proofs taken according to the instruction, expired and came to an end on the 29th of May, 1831. After that time the matter stood as if neither had ever existed; nor had Cloves more claim to enter from May 29th, 1831, to July 14th, 1832, than any other villager in Little Rock. July 14th, 1832, another pre-emption law was passed, providing, among other things, that when añ entry could not be made under the act of 1830, because the public surveys were not returned to the office of the Register and Receiver before the expiration of that act, (29th May, 1831,) then an occupant who cultivated the land in 1829, and was in actual possession when the act of 1830 was passed, should be allowed to enter under theactof 1832, the quarter section he occupied; and also adjoining lands to which the improvement extended in legal subdivisions, so as to increase his entry to a quantity not exceeding one hundred and sixty acres. Under the act of 1832, the entry in controversy was offered and afterwards allowed for the purpose of letting in complainants, so that a court of justice might investigate their claim, although it had been pronounced illegal at the department of public lands, the officers then acting under the advice of the Secretary of the Treasury. The act of 1830, and the circular under it having expired, the Commissioner issued a new circular, (28th July, 1832, 2 Land Laws and Opinions 509,) prescribing to Registers and Receivers the terms on which entries should be allowed under the act of 1832, by which circular proof was required of cultivation in 1829, and residence on the 29th of May, 1830; and that this proof should be made after the legal surveys were returned to the office of the Register and Receiver; and the right to make the proof and to enter should continue for one year after the surveys were returned, unless the lands were sooner offered at public sale; and that then the entry should be made before the public sale took place. The necessity of this new proceeding is manifest. By the act of April 5th, 1832, all actual settlers at this date, (5th April, 1832,) were authorized to enter, within six months thereafter, one half quarter section, including their respective improvements. Such rights stood in advance of claimants under the act of July 14th 1832. In the mutations of a new country, the fact was well known that improvements passed from hand to hand with great frequency by sale of the possessions; and one in possession (April 5th, 1832) could well enter an improvement cultivated in 1829, and held on the 29th of May, 1830, he having purchased such possession. If Cloyes, therefore, had sold out to another before the act of April 5th, was passed, then that other occupant, and not Cloyes, would have had the right to enter section number two; and therefore it was highly necessary to know who had the best right to a pre-emption at the time each entry was offered. A still greater necessity existed for new proof. Until the surveys were returned, it was usually improbable for the Register and Receiver to know what subdivision had been occupied, or to what land or how much, the pre-emption right extended: and as all those who had a right of entry on lands not surveyed and legally recognized as surveyed, were provided for by the act of 14th July, 1832, and the act required them to make proof and to enter within one year after the surveys were returned, by legal subdivisions according to the surveys, it is hardly possible to conceive what other course could have been adopted at the land office than that which was pursued, as the surveys were the sole guide at the local offices where the entries were made. But it is useless to speculate why the new circular was issued; the Commissioner had positive power to do so, and the act, when done, bound every enterer. Nor could a legal entry be made under the act of 14th July, 1832, without the new proof and an adjudication by the Register and Receiver, founded on such proof, that the right of entry existed; and as no such proof was offered by the complainants, they had no right to enter even the 30 88-100 acres, and certainly not the 108 61-100 acres. That an entry could not be lawfully made, without new proof to warrant it, for the lesser quantity, is our unanimous opinion; and in this we concur with those conducting the General Land Office. For another reason, I think their claim should be rejected. Little Rock was the seat of the Territorial Government, at which certain public buildings were necessary; and on the 15th of June, 1832, an act was passed that there be then granted to the Territory of Arkansas a quantity of land not exceeding one thousand acres “contiguous to and adjoining” the town of Little Rock, for the erection of a Court-House and Jail in said town, which lands shall be selected by the Governor of the Territory, and be disposed of as the Legislature shall direct, and the proceeds be applied towards building said Court-House and Jail. On the 30th of January, 1833, the Governor selected the land, and filed his entry in the land office at Little Rock, which entry was received and forwarded to the General Land Office at Washington, and there ratified. The entry included the fractional quarter section number two, now claimed by the heirs of Nathan Cloyes. By the act of March 2d, 1833, the Governor of the Territory was required to furnish to the Secretary of the Treasury a description of the boundaries of the thousand acres, and the Secretary was required to cause to be issued a patent therefor to the Governor, in trust, &c. And the Governor was directed to lay off in town lots, as part of the town of Little Rock, so much of the grant as he might deem advisable; and said Governor was authorized to sell said lots, and to dispose of the residue of said thousand acre grant, and which sale was to be at auction, as regarded the town lots and the residue of the land. And he was also authorized to select and lay off three suitable squares, within this addition to the town, in which might be erected a state-house, a court-house and a jail — one square for each building — for the use therof forever and for no other use. The sales were to be for cash, and the Governor was directed to make deeds to purchasers when the purchase money wras paid. A patent issued to Governor John Pope for the land. In October, 1833, he proceeded to sell at auction, in lots and blocks, the fraction number two, in part,to Ambrose H. Sevier, under whom most of the defendants on number two claim. Those who have answered, deny that they had any knowledge of the claim of Cloyes when they purchased and took title, and that complainants stood by, permitted the purchase, and saw great city improvements made and large sums of money expended, without objection, or any intimation being given that they intended to bring forward any such claim as the one now set up. But,as remarked in the outset, this court has no jurisdiction of these matters, and must therefore leave them to the State courts for adjudication and final settlement. How then did the claim of the complainants stand when the city lots were sold in 1833? Cloyes never offered to enter fraction number two alone: he offered to enter, says the bill, (28th May, 1831,) with the Register at Batesville, fractional quarter number two, for 30 88-100 acres, north-east fractional quarter for 42 32-100 acres, and north-west and north-east fractional quarters of number one, containing 35 41-100 acres; making in all 108 61-100 acres. The proof was made that he resided on number two, for 30 88-100 acres. This entry was refused on a ground not open to controversy. By the act of 1830, only that quarter section on which the improvement was could be entered no matter what quantity it contained. In this we are unanimous now; and also that the entry allowed is void for all but the fraction number two. Here was an offer to enter in 1831, that could not be lawfully done at that time; then a refusal to receive the entry was proper. The claim to enter 108 61-100 acres was adhered to throughout by Cloyes and his heirs. The offer to enter the whole quantity of 108 61-100 acres was again made in 1834; and we agree in opinion that the entry could not be lawfully received at the latter period for this larger quantity; less than the whole was never claimed. As already stated, the entry that was admitted in 1834, was made to enable the party to litigate his rights if any existed, as against the city title; not because the claim to enter was lawful in the estimation of the Secretary of the Treasury and the Commissioner of the General Land Office, for they had decided against its validity. The offer to enter being illegal, itis notper-ceived on what ground a court of equity can uphold the claim eveninpart, and thereby overthrow a patent of the United States, and oust purchasers who relied on such patent. In the next place, when the act of June 15th, 1832, was passed, authorizing the Governor of Arkansas Territory to locate the thousand acres, the act of 1830 had expired, no right of entry existed in Cloyes. The land appropriated to public use was to be taken “contiguous to and adjoining the town of Little Rock;” all the land adjoining was reserved by the act, subject to a selection by the Governor as a public agent; the grant was a present grant of the thousand acres, without limitation. Cloyes had no claim to interpose at that time; and on the selection being made, it gave precision to the land granted, and the title attached from the date of the act. In the language of this court, in the case of Rutherford v. Green’s heirs, (2 Wheat.206,) the grant which issued to Governor Pope in pursuance of the act of June 15th, 1832, “relates to the inception of his title.” That also was a present grant of 5,000 acres to General Greene, mady by an act of the legislature of North Carolina, but unlocated by the General Assembly. It was granted in the military district generally, and ordered to be surveyed by certain commissioners. Soon after-wards, it was located by survery, and the question presented to this court was, as to what time the title had relation for the land selected; when it was held that the grant was made by the act generally, and gave date to the title, and of necessity overreached all intervening claims for the land selected. This case is far stronger than that. Here, the act of 1830 was made part of the act of July 14th, 1832: they stood as one act and took date on the 14th of July. The act provides, “That no entry or sale should be made under the provisions of this act, of lands which shall have been reserved for the use of the United States, or either of the States. The land, to the quantity of one thousand acres, adjoining the then town of Little Rock, had been expressly reserved by the act of the 15th of June, and stood so reserved when the act of July 14th was passed, subject to selection in legal subdivisions. The act of June 15th, had no exception; the object was of too much importance to allow of any. If this villager could claim a pre-emption, so might any other; and the act of June would have been without value, as the whole grant might have been defeated by occupant claims,' and the seat of Government transferred to private owners. This is manifest. Cloves was a tinner, carrying on his trade in the edge of the town and next his dwelling; adjoining to his house and shop he cultivated a garden, and on this occupancy and cultivation his claim was founded. Others, no doubt, were similarly situated. The seat of government was located on the public lands, then unsurveyed; and if the act of July 14th, 1832, conferred an equity on Cloyes to take 160 acres, so did it on others in his situation all around the then town and adjoining thereto. If the occupant could take the land adjoining, how was it possible for the governor to add lots and squares to the scat of government? The intention of Congress manifestly contemplated that the right of selection should extend to all lands adjoining the then town; and that these were reserved for public use, is, in my judgment, hardly open to controversy, in the face of the act of July 14th. But when we take into consideration the fact that General Greene’s titles had been upheld on the principle that it took date with the act making the grant, and that the grant made in trust to Governor Pope depended on the same principle, and equally ovei’reached all intervening claims, no doubt, it would seem, could well be entertained, either at the GeneralLandoffi.ce or by purchasers, that this occupant had no just claim, and could not interfere and overthrow titles derived under the act of June 15th, 1832, And this is deemed equally true for another and similar reason. If this preference of entry for public use could be overthrown by a subsequent pre-emption law, so may every other made to secure locations for county seats and public works. The reservation was quite as definite as where salt springs and lead mines were reserved, or lands on which ship-timber existed. In such cases, the President determins that the lands shall be reserved from sale, and this is always done after the surveys are executed and returned, and certainly had such power been vested in him tore-serve lands adjoining the set of government of Arkansas, for the use thereof, he could have lawfully made the selection; and authority to do so having been conferred by Congress on the Governor, his power was equal to that of the President in similar cases, where lands are reserved for public use by general laws. For these reasons, I think the decree ought to be affirmed; and I have the more confidence in these views, because they correspond with accumulated intelligence and experience of those engaged in administering the Department of Public Lands, and with the practice pursued in the General Land Office, from the date of the act of July 14th, 1832, to this time.